UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| DEBRA LEIGHTON,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>MADISON CENTRAL SCHOOL DISTRICT #39-2,<br><br>　　　　　Defendant. | 4:16-CV-04079-RAL<br><br><br>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff Debra Leighton sued her employer Madison Central School District (MCSD) under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Doc. 1. She asserted claims for disparate treatment because of sex, discriminatory failure to hire, and retaliation. Doc. 1. She also sought compensatory and punitive damages. Doc. 1. MCSD moved for summary judgment on all claims, Doc. 29, or, in the alternative, summary judgment on Leighton's claim for punitive damages, Doc. 36. This Court grants MCSD summary judgment on the disparate treatment and retaliation claims because Leighton did not engage in protected conduct and the disparate treatment claim is merely a repackaged retaliation claim. Summary judgment is also appropriate on the punitive damages claim because Title VII does not allow plaintiffs to recover punitive damages from a school district like MCSD. This Court denies MCSD's motion for summary judgment on the failure-to-hire claim, however, because there is a material question of fact concerning whether gender played a role in MCSD's hiring decision.

# I.      Facts

Leighton began working for MCSD in 2012, when she was hired as a part-time teacher at the Gracevale Hutterite Colony (Gracevale).   Doc. 34 at ¶ 3; Doc. 41 at ¶ 3; Doc. 32 at ¶ 3. Gracevale, which is located within MCSD's boundaries, had a lengthy partnership with MCSD under which MCSD operated a rural school near Gracevale to provide K–8 schooling for Gracevale children.   Doc. 34 at ¶ 11; Doc. 41 at ¶ 11; Doc. 40 at ¶ 17; Doc. 49 at ¶ 1.   Vince Schaefer, MCSD's superintendent, delegated most of the responsibility for leadership and staff supervision at the Gracevale school to Cotton Koch, the middle school principal for MCSD.   Doc. 40 at ¶ 18; Doc. 49 at ¶ 1.

MCSD hired Leighton as one of two full-time teachers at the Gracevale school for the 2013–2014 school year.   Doc. 34 at ¶ 5; Doc. 41 at ¶ 5.   When Koch informed Leighton of MCSD's decision, she was extremely happy and expressed her emotions by hugging him.   Doc. 34 at ¶ 9; Doc. 41 at ¶ 9.   Leighton was to teach grades K–3 while Amy Andersen, the other full-time teacher at the Gracevale school, would teach grades 4–8.   Doc. 34 at ¶ 10; Doc. 41 at ¶ 10; Doc. 40 at ¶¶ 21, 23; Doc. 49 at ¶ 1.

Problems developed at the Gracevale school in early 2014.   Doc. 34 at ¶ 12; Doc. 41 at ¶ 12.   Gracevale was satisfied with Leighton, but had complaints about Andersen's teaching.   Doc. 40 at ¶¶ 24, 28; Doc. 49 at ¶ 1; Doc. 32 at ¶ 5.   One Gracevale representative even asked that Andersen be fired.   Doc. 40 at ¶ 27; Doc. 49 at ¶ 2.   MCSD also learned that Gracevale was dividing and that approximately half of the Gracevale students would be moving to a colony in the Rutland school district for the upcoming 2014–2015 school year.   Doc. 40 at ¶ 20; Doc. 49 at ¶ 1.

On or about February 5, 2014,[1] Koch held a meeting with Leighton and Andersen to address problems at the Gracevale school and to encourage Leighton and Andersen to get along better, support each other, and follow the chain of command. Doc. 34 at ¶¶ 13–14; Doc. 41 at ¶¶ 13–14. During the meeting, Koch referred to Leighton as a "princess" because of how Gracevale thought she could do no wrong. Doc. 34 at ¶ 17; Doc. 41 at ¶ 17; Doc. 40 at ¶ 29; Doc. 50 at ¶ 2; Doc. 43-1 at 3. Koch also told Andersen that he would continue to support her, which prompted Andersen to kiss Koch's hand and declare that he was "the best boss ever." Doc. 40 at ¶ 30; Doc. 49 at ¶ 1; Doc. 34 at ¶ 15; Doc. 41 at ¶ 15. The kissing incident lasted no more than a few seconds and was not initiated by Koch. Doc. 34 at ¶ 16; Doc. 41 at ¶ 16.

On February 10, 2014, Koch gave Leighton a written evaluation of a class he saw her teach. Doc. 40 at ¶ 32; Doc. 49 at ¶ 1. The evaluation was positive, with Koch telling Leighton "[g]reat job" and thanking her "for all the work you do for our students." Doc. 40 at ¶ 32; Doc. 49 at ¶ 1; Doc. 43-7. On February 20, 2014, Leighton met with Koch to discuss her concerns about Andersen and what had occurred during the February 5, 2014 meeting. Doc. 40 at ¶ 34; Doc. 49 at ¶ 2; Doc. 43-3 at 2. Among other things, Leighton told Koch that she had been offended when Koch called her a princess and when Andersen kissed Koch's hand. Doc. 40 at ¶ 34; Doc. 49 at ¶ 2.[2] Koch replied that he did not mean the princess comment in a negative way, that he did not think anything of the kissing incident, and that Leighton would need to get over it. Doc. 40 at ¶ 35; Doc. 49 at ¶ 2. According to Leighton, she told Koch that she was unsatisfied with his responses and wanted to take her complaints about Andersen to Schaefer; Koch replied that Leighton was not allowed to speak to Schaefer about Andersen, and that if he found out that she had, he would terminate her

---

[1] Leighton says this meeting occurred on February 5, 2014. Doc. 40 at ¶ 29. Koch testified that the meeting took place in February 2014 but that he could not recall the exact date. Doc. 43-1 at 3; Doc. 50 at ¶ 2.
[2] Koch testified that he didn't remember the February 20 conversation at all. Doc. 43-1 at 4–5.

on the spot. Doc. 40 at ¶ 36.[3] Koch denies threatening to terminate Leighton and saying she could

not speak to Schaefer. Doc. 50 at ¶ 3. While Koch contends that he lacks the authority to fire

Leighton, Doc. 50 at ¶ 3, Leighton asserts that she found Koch's alleged threat realistic because

he had the authority to recommend her nonrenewal and because MCSD placed deference on

administrative recommendations, Doc. 40 at ¶ 37; Doc. 43-1 at 18; Doc. 43-2 at 7.

On March 10, 2014, the MCSD school board approved a reduction in force (RIF)

eliminating five teaching positions for the 2014–2015 school year, including Andersen's and

Leighton's positions at the Gracevale school. Doc. 34 at ¶ 26; Doc. 41 at ¶ 26; Doc. 40 at ¶ 39;

Doc. 43-11; Doc. 31 at ¶ 9; Doc. 31-3 at 4. The collective bargaining agreement between the

MCSD and the Madison Education Association contained a provision regarding a RIF. Doc. 34

at ¶ 24; Doc. 41 at ¶ 24. Loss of student enrollment is the usual reason for employing the RIF

procedure. Doc. 34 at ¶ 25; Doc. 41 at ¶ 25; Doc. 32 at ¶ 8. The reason given for the March 2014

RIF was that Gracevale was splitting and that the MCSD would thus lose about half of the students

it served at the Gracevale school. Doc. 40 at ¶ 40; Doc. 43-2 at 4; Doc. 31 at ¶ 8; Doc. 34 at ¶ 25;

Doc. 41 at ¶ 25. Leighton contends that Koch "had a part in the RIF analysis." Doc. 40 at ¶ 42.

Koch submitted an affidavit saying that he had nothing to do with the RIF, but that he did "provide

---

[3]Leighton alleges in her complaint and suggests in her brief that Koch threatened to terminate her if she complained to Schaefer about the hand-kissing incident and the princess comment. Doc. 1 at ¶¶ 51–53; Doc. 42 at 21. However, Leighton's statement of material facts states that Koch threatened to terminate her if she took her complaints about Andersen to Schaefer. Doc. 40 at ¶ 36. The letter Leighton cites in support of this statement of material fact describes how Leighton complained to Koch on February 20, 2014, about Andersen's abusive behavior toward her and the children, how Leighton asked Koch if she could take her concerns about Andersen to Schaefer, and how Koch threatened to terminate Leighton if she talked about Andersen. Doc. 43-28 at 2–3. The letter does not say that Leighton asked Koch if she could take her complaints about the hand-kissing incident and the princess comment to Schaefer or that Koch threatened her with termination if she did so. What was said during any meeting on February 20, 2014, involves disputed facts, and for purposes of this opinion, this Court views the disputed facts in the light most favorable to Leighton.

4

information that based on what we knew at the time, only 15 students would be returning to school at Gracevale." Doc. 50 at ¶ 4.

MCSD contends that "within several weeks" of the RIF, it reclassified certain positions such that MCSD could continue supplying two teachers to Gracevale for the 2014–2015 school year. Doc. 34 at ¶ 28; Doc. 41 at ¶ 28. There is some disagreement about when MCSD began advertising for these positions. According to Leighton, MCSD posted a job for one full-time K–8 teacher at the Gracevale school shortly after the RIF. Doc. 40 at ¶ 47. The closing date to apply for this position was March 28, 2014. Doc. 40 at ¶ 47. Leighton sent an undated letter to Koch and Schaefer saying that she would not be applying for the position because she did not believe that one teacher could meet the requirements of the job description. Doc. 32-1; Doc. 43-16; Doc. 40 at ¶ 48. Leighton contends that on April 1, 2014, she saw that MCSD had posted the following three jobs for the 2014–2015 school year: a full-time Title 1 and ELL teacher at the Gracevale school; a full-time K–8 teacher at the Gracevale school; and a junior kindergarten teacher at the MCSD main campus. Doc. 40 at ¶ 49; Doc. 43-18; Doc. 43-17; Doc. 43-32. MCSD claims that it posted the K–8 position on March 14, 2014, and that the applications for that position were due by March 28.[4] Doc. 34 at ¶ 30; Doc. 32 at ¶ 9. MCSD claims that it posted the Title I and ELL position on April 4, 2014, and that this position closed on April 17, 2014.[5] Doc. 34 at ¶ 31; Doc. 32 at ¶ 9.

---

[4]MCSD's statement of material facts states that the K–8 position was posted on March 4, 2014. Doc. 34 at ¶ 30. This March 4 date appears to be a typo, as the affidavit MCSD cites in support states that MCSD posted the position on March 14, 2014. Doc. 32 at ¶ 9.
[5]MCSD's statement of material facts states that the Title 1 and ELL position was posted on April 17, 2014. Doc. 34 at ¶ 31. This April 17 date appears to be a typo, as the affidavit MCSD cites in support states that MCSD posted the position on April 4, 2014, and closed the position on April 17. Doc. 32 at ¶ 9.

On April 3, 2014, Leighton met with Koch to inquire about the K–8 and Title 1 positions at the Gracevale school. Doc. 40 at ¶ 54; Doc. 49 at ¶ 2; Doc. 43-32 at 1–2. Koch informed Leighton that he was looking for someone who did not clash with the Gracevale leadership. Doc. 40 at ¶ 54; Doc. 49 at ¶ 2. On April 14, 2014, Leighton applied for the two teaching positions at the Gracevale school and the junior kindergarten position at the MCSD main campus. Doc. 40 at ¶ 55; Doc. 43-20. Koch acknowledged during his deposition that Leighton's application was sufficient and that he knew she was applying for the three teaching positions as of April 14, 2014.[6] Doc. 40 at ¶ 56; Doc. 49 at ¶ 2; Doc. 43-1 at 8–9.

Koch selected himself and two teachers he supervised to act as the hiring committee for the Gracevale positions. Doc. 40 at ¶ 60; Doc. 50 at ¶ 7; Doc. 43-1 at 9. Koch had the authority to choose whom to interview and to conduct the interviews with the two other members of the committee. Doc. 40 at ¶ 58; Doc. 50 at ¶ 6; Doc. 43-1 at 11, 13. Koch's testimony suggests that he alone chose whom to interview for the Gracevale positions, Doc. 43-1 at 11, 13, but he submitted a later affidavit stating that the other two members of the hiring committee could also determine which candidates to interview, Doc. 50 at ¶ 6. Under the usual hiring process for MCSD, the hiring committee would recommend a candidate to the superintendent, the superintendent would send the recommendation to the school board if he approved of the

---

[6]MCSD suggests in its opening brief that Leighton's undated letter shows that she did not want the K–8 position at the Gracevale school. Doc. 35 at 8; Doc. 34 at ¶ 34. MCSD's argument is based on its belief that it advertised the K–8 position only once, from March 14, 2014 until March 28, 2014. Leighton explains that her undated letter referred to the K–8 position as MCSD initially advertised it, with only one teacher being allocated to the Gracevale school. Doc. 41 at ¶ 33. Leighton contends that once MCSD advertised for the K–8 and Title 1 positions at the Gracevale School on April 1, she applied for both positions because she felt that two teachers would be adequate staffing at the Gracevale school. Regardless of MCSD's assertions about the letter, Leighton filed an April 14, 2014 email she sent to Koch and Schaefer saying that she was applying for the junior kindergarten position and the two Gracevale positions, Koch agreed that he knew Leighton was applying for the positions, and MCSD admitted in its answer that Leighton applied for all three positions. Doc. 8 at ¶ 17.

candidate, and the school board would then make the final hiring decision. Doc. 34 at ¶ 38; Doc. 41 at ¶ 38.

Although Koch had given Leighton a "Meets Standards" rating for the 2013–2014 school year, Doc. 40 at ¶ 51; Doc. 49 at ¶ 2, he decided not to interview Leighton for any of the teaching positions, Doc. 40 at ¶ 61; Doc. 50 at ¶ 8; Doc. 43-1 at 13. MCSD contends, and Leighton disputes, that MCSD's first two choices for the K–8 position at Gracevale were women; MCSD avers that both women accepted other jobs before their employment could be presented to the MCSD school board. Doc. 34 at ¶¶ 40–43; Doc. 41 at ¶¶ 40–43; Doc. 43-1 at 12–14. According to MCSD, the hiring committee's third choice for the K–8 position was Tom Nielsen.[7] Doc. 34 at ¶ 44; Doc. 41 at ¶ 44. When Koch called Nielsen around April 21, 2014, Nielsen said he would accept the K–8 position if it were offered to him. Doc. 43-1 at 14; Doc. 32 at ¶ 21; Doc. 40 at ¶¶ 63–64; Doc. 50 at ¶¶ 9, 11. The MCSD school board ultimately approved offering a contract to Nielsen during its May 2014 meeting and Nielson accepted the position as a K–8 teacher at the Gracevale school. Doc. 40 at ¶ 63; Doc. 32 at ¶ 21.

As for the Title 1 position at Gracevale, the hiring committee recommended Andersen. Doc. 34 at ¶ 45; Doc. 41 at ¶ 45; Doc. 50 at ¶ 66; Doc. 43-1 at 19.[8] Koch informed Andersen that

---

[7]Relying on an email from Schaefer and a letter from Koch, Leighton disputes that the hiring committee's first two choices for the K–8 position were women. Doc. 41 at ¶¶ 40–44. Schaefer's email, sent to MCSD school board members on June 12, 2014, stated that Koch had recommended Andersen for a position with Gracevale, but that Schaeffer had ultimately decided not to approve Andersen's contract. Doc. 43-30. Koch's letter, sent to Schaefer on May 19, 2014, states: "It was very clear to me that hiring Tom Nielson [sic] and Amy Andersen was the best for the children at Gracevale. All other candidates were not ready for the position." Doc. 43-24. Leighton argues that these documents suggest that Andersen and Nielsen were the hiring committee's first and only choices for the positions at Gracevale. Koch testified that when he sent the May 19, 2014 letter, Schaefer knew that the first two choices for the K–8 position had accepted other job offers. Doc. 43-1 at 14–15.

[8]Although Leighton asserts that Koch alone recommended Andersen for the Title 1 position, she has not offered sufficient evidence to create a genuine dispute of fact on this issue. Regardless,

she was being recommended for a contract but asked her to keep this information confidential until the school board acted upon the recommendation. Doc. 34 at ¶ 47; Doc. 41 at ¶ 47; Doc. 40 at ¶ 65; Doc. 50 at ¶ 12. Emails from Schaefer in May and June of 2014 suggest that Andersen had accepted a contract offer for the Title 1 position, although the MCSD school board had yet to formally approve the contract. Doc. 43-25; Doc. 43-26; Doc. 43-30; Doc. 40 at ¶¶ 66–67; Doc. 50 at ¶¶ 12–14; Doc. 41 at ¶ 46; see also Doc. 43-37.

On April 29, 2014, Leighton met with Koch to ask when the interviews for the three positions for which she had applied would begin. Doc. 40 at ¶ 62; Doc. 50 at ¶ 10. Koch informed Leighton that the K–8 position was filled and that the Title 1 position had been "tabled." Doc. 40 at ¶ 62; Doc. 50 at ¶ 10. He did not mention the junior kindergarten position. Doc. 40 at ¶ 62; Doc. 50 at ¶ 10. On May 16, 2014, Andersen informed Leighton that she had been offered the Title 1 position three-and-a-half-weeks earlier. Doc. 40 at ¶ 65; Doc. 50 at ¶ 12. Koch sent a letter to Schaefer on May 19, 2014, explaining that in addition to having Nielsen and Andersen teach at Gracevale, MCSD had secured a full-year student teacher for the Gracevale school for the 2014–2015 school year.[9] Doc. 40 at ¶ 68; Doc. 50 at ¶ 15; Doc. 43-24. Koch explained that this would make the ratio "three teachers to 15 students. It will also provide two male teachers. This is a first for the Gracevale Colony!" Doc. 40 at ¶ 68; Doc. 50 at ¶ 15; Doc. 43-24. Just a few days later, however, MCSD learned that Gracevale was considering using the open-enrollment option to join the neighboring school district in Chester, South Dakota. Doc. 43-26; Doc. 43-31; Doc. 40 at ¶ 70. On May 23, 2014, Schaefer sent an email to the MCSD school board discussing the split in the Gracevale colony and the open-enrollment possibility:

the question of whether Koch or the hiring committee recommended Andersen is not material to this Court's decision.

[9] The student teacher came from Dakota State University and thus did not impose any additional cost on Gracevale or MCSD. Doc. 50 at ¶ 15.

> With the division of the colony and new leadership who want to make things happen this has become a difficult issue. We are frustrated with how to approach and who to work with. At this time we understand that at a level higher than the local colony a decision was made to pursue open enrollment to Chester with the primary reason being they refuse to accept Amy Andersen as their teacher. We have hired Tom Nielsen and Amy Andersen to be the teachers along with and [sic] yearlong male student teacher for 16 students starting this fall.

Doc. 43-26; Doc. 40 at ¶ 70. Koch sent an email to Schaefer about Gracevale on May 26, 2014, stating:

> I have been thinking (worrying) all weekend about this issue. A couple of things that came to me 1. If we go to the colony and tell them Andersen will be moved to town the trap we will walk into will be hiring Debbie Leighton. I think they will try to play that card. I will support whatever you decide on both teachers.

Doc. 43-27; Doc. 40 at ¶ 73; Doc. 49 at ¶ 2.[10]

On May 28, 2014, Leighton and her husband Brian met with Koch and Schaefer to discuss Leighton's concerns about why she wasn't interviewed for the teaching positions for which she had applied. Doc. 40 at ¶ 74; Doc. 49 at ¶ 2. Leighton suggested that she did not receive an interview because she had complained about Koch calling her a princess and Andersen kissing Koch's hand. Doc. 40 at ¶ 74; Doc. 49 at ¶ 2. Koch explained Nielsen's hiring by saying that Gracevale had wanted a "male figure" at the school and someone with more math experience. Doc. 40 at ¶ 74; Doc. 49 at ¶ 2.

On June 12, 2014, Schaefer sent an email to MCSD school board president Tom Farrell explaining that he had decided not to approve Andersen's contract for the Title 1 position at Gracevale. Doc. 40 at ¶ 76; Doc. 49 at ¶ 2; Doc. 43-30; Doc. 34 at ¶ 49; Doc. 41 at ¶ 49. Schaefer

---

[10]Koch testified that he could not recall what the "trap" he referred to was. Doc. 40 at ¶ 73; Doc. 43-1 at 16.

wrote that "[h]aving 'taken back' the contract offered to Amy after a closed discussion with her effectively removes her from that school setting." Doc. 40 at ¶ 76; Doc. 49 at ¶ 2; Doc. 43-30.

On July 9, 2014, Leighton signed a contract with the Chester school district to teach at the Gracevale school. Doc. 30-2 at 3, 7; Doc. 34 at ¶¶ 50–51; Doc. 41 at ¶¶ 50–51.[11] Her annual salary under the contract would be $37,250.00.[12] Doc. 34 at ¶ 51; Doc. 41 at ¶ 51. On July 14, 2014, Leighton appeared before the MCSD school board to voice her complaints about Koch, Andersen, and not having received an interview. Doc. 40 at ¶ 78; Doc. 49 at ¶ 2; Doc. 43-32. She also submitted written questions to the school board, one of which stated: "We would like to know the views of the board upon a female applicant being told that he wanted a male in that position. Mr. Koch told us that he hired Mr. Nielsen because he needed a male presence at the colony." Doc. 40 at ¶ 78; Doc. 49 at ¶ 2; Doc. 43-33.

By mid-July, MCSD had accepted that Gracevale was going to open enroll its students in the Chester school district. Doc. 40 at ¶ 82; Doc. 49 at ¶ 2. Because MCSD already had a binding contract with Nielsen, it reassigned him to an open middle school position. Doc. 40 at ¶ 82; Doc. 49 at ¶ 2.

---

[11]MCSD's statement of material facts says that Leighton had applied for a teaching position with Rutland school district back on April 12, 2014, and that she signed a contract with Rutland on May 5, 2014. Doc. 34 at ¶¶ 35–36; Doc. 41 at ¶¶ 35–36. Around the same time Leighton accepted a job with the Chester school district, however, she paid the Rutland district a fee to break her contract with it. Doc. 30-2 at 1, 3, 9. MCSD does not argue that Leighton's application or contract with Rutland was the reason MCSD didn't hire her for the positions at Gracevale.

[12]MCSD includes multiple statements of material fact attempting to show that Leighton made more money with the Chester school district and did not suffer any monetary damages because of not being hired by MCSD for the 2014–15 school year. See Doc. 34 at ¶¶ 55–62. Leighton agrees with some of these facts but disputes others. See Doc. 41 at 55–62. MCSD may offer this evidence about Leighton's salary and the loss of benefits at trial, but it is not a ground for granting MCSD's motion for summary judgment. After all, Leighton is seeking damages beyond front pay and lost benefits. See Doc. 1. Moreover, even if Leighton recovered only nominal damages, she could still be entitled to attorney's fees. Parton v. GTE N., Inc., 971 F.2d 150, 155–56 (8th Cir. 1992).

On August 4, 2014, the MCSD school board held an executive session with Koch to discuss Leighton's complaints. Doc. 40 at ¶ 84; Doc. 43-35; Doc. 43-2 at 10. The following day, Farrell sent a letter to Leighton notifying her of the executive session and explaining that while the board could not answer her questions concerning personnel because such information was confidential by law, the board "did have in depth discussion and changes will be implemented to protect the applicant as well as the district in the future." Doc. 43-35; Doc. 40 at ¶ 85. Farrell concluded by saying that the school board believed it had given adequate attention to Leighton's concerns and that the board would not review the matter any further. Doc. 40 at ¶ 85; Doc. 43-35.

On August 6, 2014, Koch called one of Leighton's former employers for a reference. Doc. 40 at ¶ 86; Doc. 50 at ¶ 18; Doc. 43-1 at 17; Doc. 43-36. He documented a negative reference and completed a MCSD reference form for Leighton, marking "Does NOT meet the standards of the Madison Central School District." Doc. 40 at ¶ 86; Doc. 50 at ¶ 18; Doc. 43-1 at 17; Doc. 43-36. Koch testified that he conducted the reference check because he felt attacked by Leighton and needed to know "did I do the right thing, did I make the right choice." Doc. 40 at ¶ 87; Doc. 50 at ¶ 18; Doc. 43-1 at 17.

Leighton filed a discrimination charge with the EEOC in November 2014, alleging that MCSD had discriminated against her based on her gender and retaliated against her for engaging in protected activity. Doc. 1 at ¶ 7; Doc. 8 at ¶ 7. MCSD's response to the charge stated that "Koch may have told Ms. Leighton that Gracevale had been asking for a male teacher, because that was the fact." Doc. 43-39 at 1; Doc. 40 at ¶ 91. Thereafter, Gracevale's president and its school administrator submitted the following letter to the EEOC:

> In regards to Mr. Koch's claim in section II.9 [of MCSD's EEOC response] that Gracevale Colony had been asking for a male teacher this statement is not true. We the Colony have been asked by Mr. Koch if we had any issues with him hiring a male teacher, our

> response was there would be no problem. We at no time asked for
> a male teacher.

Doc. 43-38; Doc. 40 at ¶ 91.

Leighton sued MCSD under Title VII in this Court, asserting claims for "disparate treatment because of sex" (Count I), discriminatory failure to hire (Count II), and retaliation for opposing discrimination (Count III). Doc. 1. She sought compensatory and punitive damages against MCSD as well as attorney's fees. Doc. 1. MCSD moved for summary judgment on all of Leighton's claims, Doc. 29, or, in the alternative, for summary judgment on her request for punitive damages, Doc. 36.

## II. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007); see also Reasonover v. St. Louis Cty., 447 F.3d 569, 578 (8th Cir. 2006) ("Evidence, not contentions, avoids summary

judgment.") (quoting Mayer v. Nextel W. Corp., 318 F.3d 803, 809 (8th Cir. 2003)).  Summary

judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal

Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of

every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

Cases alleging discrimination are subject to the same summary judgment standard as any other

case. Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc).

## III.  Discussion

### A.  Count I

Leighton's theory under Count I of her complaint is somewhat confusing; although Count

I is labeled "Disparate Treatment Because of Sex" and cites to 42 U.S.C. § 2000e-2(a)(1)–(2), the

allegations in Count I overlap with those in Count III, Leighton's retaliation claim under 42 U.S.C.

§ 2000e-3(a).  Discrimination and retaliation are distinct wrongs under Title VII.  42 U.S.C.

§§ 2000e-2(a), -3(a).  Section 2000e-2(a), Title VII's main antidiscrimination provision, makes it

unlawful to discriminate against an employee based on that employee's "race, color, religion, sex,

or national origin." Id. § 2000e-2(a).  To establish a prima facie case of disparate treatment based

on sex under § 2000e-2(a), a plaintiff generally must show that: (1) she is a member of a protected

class; (2) she was qualified to perform her job; (3) she suffered an adverse employment action;

and (4) she was treated differently than similarly situated males. Tenge v. Phillips Modern Ag

Co., 446 F.3d 903, 910 (8th Cir. 2006).  A plaintiff can also meet this fourth element of a prima

facie case by producing "some other evidence that would give rise to an inference of unlawful

discrimination." Turner v. Gonzales, 421 F.3d 688, 694 (8th Cir. 2005) (quoting Putman v. Unity

Health Sys., 348 F.3d 732, 736 (8th Cir. 2003)).  A separate section of Title VII, 42 U.S.C.

§ 2000e-3(a), forbids retaliation against an employee "because he has opposed any practice made

an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation under § 2000e-3(a) requires a showing that: (1) the plaintiff engaged in protected activity; (2) the plaintiff suffered a materially adverse employment action; and (3) the adverse employment action was causally linked to the protected activity. Pye v. Nu Aire, Inc., 641 F.3d 1011, 1021 (8th Cir. 2011). The difference between a discrimination claim and a retaliation claim under Title VII is important; while a plaintiff alleging discrimination can succeed by showing that a protected characteristic was a "motivating factor" for the employer's decision, a plaintiff alleging retaliation has the higher burden of showing that unlawful retaliation was the "but-for cause" of the adverse action. Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 349, 352 (2013).

Here, Count I of Leighton's complaint reads like a retaliation claim. Although one paragraph of Count I alleges that MCSD treated men and women differently because Koch used "gender-stereotyped language" and "encourag[ed] physical contact" with female employees,[13] Doc. 1 at ¶ 38, other paragraphs of Count I allege that MCSD terminated Leighton through the RIF because she complained about Koch's behavior, Doc. 1 at ¶¶ 39–42. Specifically, Leighton alleges in Count I that her termination via the RIF was an adverse employment action, Doc. 1 at ¶ 39, and that MCSD was "motivated by an improper motive to eliminate Leighton as a [MCSD] employee because of her complaint to Koch," Doc. 1 at ¶ 42. Thus, while Leighton refers to Count I as a "disparate treatment" claim and gives a few examples of being treated differently than male employees, she alleges that the adverse employment action was because of her complaints rather than her gender. Leighton's brief only mentions Count I twice, stating that her failure-to-hire claim

---

[13]These allegations are based on Koch calling Leighton a "princess" and Andersen kissing Koch's hand. It is undisputed that Leighton hugged Koch herself when she was hired full time for the 2013–2014 school year, Doc. 34 at ¶ 9; Doc. 41 at ¶ 9, that Koch did not initiate Andersen kissing his hand, Doc. 34 at ¶ 16; Doc. 41 at ¶ 16, and that Koch referred to Leighton as a "princess" on one occasion only to describe how Gracevale thought she could do no wrong, Doc. 34 at ¶¶ 17, 20; Doc. 41 at ¶¶ 17, 20.

14

(Count II) is "the stronger of" her two sex discrimination claims, Doc. 42 at 7, and that her retaliation claim "can co-exist with or as an alternative to her sex discrimination claim," Doc. 42 at 15.

Of course, just because Leighton alleges that MCSD retaliated against her for complaining about the hand-kissing incident and the princess comment does not give rise to a discrimination claim under § 2000e-2(a). See Heuer v. Weil-McLain, 203 F.3d 1021, 1022 (7th Cir. 2000) (holding that an employer's retaliation against an employee for filing a sexual harassment charge could not serve as a basis for a sexual harassment claim under Title VII). If that were the rule "every claim of retaliation [for complaining about discrimination] would be a claim of discrimination." Id. Count III, Leighton's retaliation claim, is similar to Count I, the only major difference being that Count III alleges that both the RIF and MCSD's refusal to interview Leighton were adverse employment actions MCSD took in retaliation for Leighton complaining about Koch. As explained below, MCSD is entitled to summary judgment on Count III of Leighton's complaint because Leighton cannot establish that she engaged in protected conduct. Leighton cannot bypass this protected conduct requirement by simply repackaging her retaliation claim as a "disparate treatment" claim and bringing it under § 2000e-2(a). MCSD is therefore entitled to judgment as a matter of law on Count I of Leighton's complaint.

### B.    Count II

Leighton alleges in Count II that MCSD violated Title VII by refusing to hire her for the positions she applied for because of her sex. Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To prevail on her

failure-to-hire claim, Leighton must either show direct evidence of discriminatory motive or intent, or rely on the burden-shifting method in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to create an inference of discrimination. Blake v. MJ Optical, Inc., 870 F.3d 820, 825–26 (8th Cir. 2017). Leighton contends that she has direct evidence of discrimination and, alternatively, that she can satisfy the McDonnell Douglas test.

The Eighth Circuit has explained that direct evidence in this context "is not the converse of circumstantial evidence . . . . [but] is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Torgerson, 643 F.3d at 1044 (internal quotation marks omitted) (quoting Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). Direct evidence may include "remarks of the employer that reflect a discriminatory attitude, . . . comments which demonstrate a discriminatory animus in the decisional process," and comments "uttered by individuals closely involved in employment decisions." Roberts v. Park Nicollet Health Servs., 528 F.3d 1123, 1128 (8th Cir. 2008) (quoting EEOC v. Liberal R-II Sch. Dist., 314 F.3d 920, 923 (8th Cir. 2002)). By contrast, "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process" do not constitute direct evidence. Elam v. Regions Fin. Corp., 601 F.3d 873, 878 (8th Cir. 2010) (quoting Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir. 2000)). If Leighton produces direct evidence of discrimination, she does not need to rely on the McDonnell Douglas framework to survive summary judgment. Griffith, 387 F.3d at 736.

Leighton's direct case is built on Koch's statement that MCSD hired Nielsen because Gracevale wanted a "male figure" at the school and someone with more math experience. She

contends that this statement is direct evidence of discrimination because it is "contemporaneously linked" to MCSD's decision not to hire her for the K–8 position at Gracevale. Doc. 42 at 10. MCSD disagrees, arguing that Koch was not a decisionmaker, that his statement was unrelated to the decisional process, and that he was merely repeating what Gracevale wanted.

Koch's statement is sufficient direct evidence to defeat summary judgment. Although MCSD argues that the school board has the ultimate authority to decide whether to hire someone, Doc. 34 at ¶ 53; Doc. 31 at ¶ 5, there are circumstances where an individual is so closely involved in the decision-making process that his statements can constitute direct evidence. See King v. United States, 553 F.3d 1156, 1161 (8th Cir. 2009) (explaining that direct evidence may include comments by individuals closely involved with employment decisions); Mohr v. Dustrol, Inc., 306 F.3d 636, 641 (8th Cir. 2002) (finding that comments by supervisor not "officially responsible" for hiring were direct evidence where supervisor played a "pivotal role" in hiring and officials deferred to his hiring decision), abrogated on other grounds by Desert Palace, Inc. v. Costa, 539 U.S. 90, 95 (2003). At MCSD, the hiring committee essentially acts as a gatekeeper: it recommends a candidate to the superintendent who then passes that recommendation along to the school board if he approves. Doc. 34 at ¶ 38. Farrell acknowledged in his testimony that the school board has little to do with the hiring process until the superintendent presents the board with a candidate. Doc. 43-2 at 3–4, 7. When asked about the MCSD school board's procedure for interviewing and selecting candidates who will receive a contract with MCSD, Farrell testified: "Each of the administrators are given the authority to do what they feel best fits. Most use a hiring committee of staff that they have. Again, the board does not directly work with any of the hiring of teachers." Doc. 43-2 at 7. Koch exercised significant control over the hiring committee for the Gracevale positions; he not only selected the committee (choosing himself and two teachers he

supervised), but also had the authority to select whom to interview and to conduct the interviews themselves. Doc. 40 at ¶¶ 58, 60; Doc. 50 at ¶¶ 6–7; Doc. 43-1 at 9, 11, 13. Although Koch claims in an affidavit that the other two members of the hiring committee could also select which candidates to interview, Koch's testimony during his deposition suggests that he alone selected the interviewees for the Gracevale positions. Doc. 43-1 at 11, 13. A reasonable jury could find that Koch was closely involved in the decision not to hire Leighton for the K–8 position.

Moreover, Koch's "male figure" statement was not simply a stray remark unrelated to the decisional process. Koch made the statement while meeting with Leighton and her husband to discuss why Leighton had not received an interview for the teaching positions. Koch explained Nielsen's hiring for the K–8 position by saying that Gracevale wanted a "male figure" at the school and someone with more math experience. Taken in the light most favorable to Leighton, the gist of Koch's statement is that gender was one of the reasons Leighton was not hired for the K–8 position. An admission like Koch's that an illegal criterion factored into an employment decision qualifies as direct evidence. See Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999) (stating that in a sex discrimination case, direct evidence "might include proof of an admission that gender was the reason for an action"). Although MCSD appears to argue that Koch's statement is not evidence of discrimination because he was merely repeating Gracevale's preferences, there are at least two problems with MCSD's position. First, the president and the school administrator of Gracevale submitted a signed letter to the EEOC stating that Gracevale had not requested a male teacher. Doc. 43-38. MCSD argues that this letter is inadmissible because it is unsworn and "clearly hearsay," Doc. 54 at 8, but the standard at the summary judgment stage is whether the evidence "*could* be presented at trial in an admissible form," Gannon Int'l Ltd. v. Blocker, 684 F.3d 785, 793 (8th Cir. 2012). The information in the letter could likely

be reduced to admissible form by having Gracevale's president and its school administrator testify directly about the information at trial. Second, Koch's statement is evidence of discrimination even if Gracevale told him it wanted a male teacher. Absent circumstances not present here,[14] customer or client preference is not a defense to sex discrimination claims under Title VII. Tamosaitis v. URS Inc., 781 F.3d 468, 482–83 (9th Cir. 2015) ("In the . . . context of Title VII actions, we have long held that a customer's discriminatory preference does not justify an employer's discriminatory practice unless—for those protected categories for which the defense is available under Title VII—the discriminatory requirement amounts to a bona fide occupational qualification."); Rucker v. Higher Educ. Aids Bd., 669 F.2d 1179, 1181 (7th Cir. 1982) ("Customer preference has repeatedly been rejected as a justification for discrimination against women."); Sparenberg v. Eagle All., No. JFM-14-1667, 2015 WL 6122809, at *6 (D. Md. Oct. 15, 2015) ("Courts have consistently held that, in the employment law context, client or consumer preference cannot cleanse an employer's actions—even when the employer claims to have acted free of bias."). In other words, MCSD can be liable under Title VII for acting on Gracevale's alleged discriminatory bias even if MCSD did not harbor any bias itself. A reasonable fact finder could conclude from Koch's statement that gender was more likely than not a motivating factor in the decision not to hire Leighton for the K–8 position.

MCSD argues, however, that its attempt to hire two women for the K–8 position before it offered the job to Nielsen belies Leighton's claim of gender bias. Leighton disputes that MCSD attempted to hire two women, contending that Nielsen was the hiring committee's first and only

---

[14]Title VII allows employers to make employment decisions on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e). MCSD does not argue that gender is a bona fide occupational qualification for the K–8 position at the Gracevale school.

choice. Yet even assuming that MCSD did offer two women the K–8 position before hiring

Nielsen, this fact, although relevant to MCSD's defense, would not establish as a matter of law

that MCSD did not engage in sex discrimination against Leighton. As the Seventh Circuit recently

explained, "[a] failure to discriminate against all women does not mean that an employer has not

discriminated against one woman on the basis of sex." Hively v. Ivy Tech Cmty. Coll. of Ind.,

853 F.3d 339, 346 n.3 (7th Cir. 2017) (en banc); see also Strickland v. United Parcel Serv., Inc.,

555 F.3d 1224, 1230 (10th Cir. 2009) ("A sex discrimination claim does not fail simply because

an employer does not discriminate against every member of the plaintiff's sex."); Pitre v. W. Elec.

Co., 843 F.2d 1262, 1272 (10th Cir. 1988) ("[T]hat a member of a protected class was hired or

promoted in place of a Title VII plaintiff has repeatedly been held insufficient to insulate the

employer from liability."). Taking the evidence in the light most favorable to Leighton, Koch's

statement suggests that gender was one of the reasons the hiring committee chose Nielsen instead

of Leighton for the K–8 position. That MCSD may have offered the job to two women previously

does not conclusively negate Leighton's direct evidence of discrimination against her.

MCSD also argues that Koch's affidavit shows that MCSD had valid, nondiscriminatory reasons for not selecting Leighton. In paragraph twenty-nine of his affidavit, Koch gave the following reasons he did not view Leighton as the best candidate for the position:

> a. Higher levels of math instruction. I did not believe Mrs. Leighton possessed the skills to teach in the K–8 classroom. She admitted that in her undated letter, Exhibit 1.[15]
> b. When Gracevale split into two colonies, Gracevale had more students in grades 5–8, Mrs. Leighton's experience at MCSD had been with primary grades.
> c. Students normally begin in 4[th] grade to use math and reading they learned in primary grades. At this time not all students are learning at the same pace. However, the students would be

---

[15]Koch is referring here to Leighton's undated letter explaining that she would not be applying for the K–8 position as it was initially advertised. Contrary to Koch's assertion, Leighton did not admit in her letter that she lacked the skills for the K–8 position. Doc. 32-1. Rather, she explained in the letter that she thought it would be difficult for only one teacher to handle all grades at Gracevale. Doc. 32-1.

learning a concept from specific grade level book. Both positions required someone who could differentiate lessons for students in the upper level content in order to provide the best education possible for each student. I did not believe Mrs. Leighton could differentiate lessons at the upper grades.

       d. Mrs. Leighton's education marks for almost all of her students was [sic] Satisfactory in their learning. However, some students could struggle with the English language and reading. The majority of Gracevale's 5–8 grade standardized test in STAR Reading indicated they were not satisfactory.

       e. The two other members for the Hiring Committee and I believed the other individuals we selected possessed better teaching skills than Mrs. Leighton. That is the only reason we made the selections and recommendations as we did.

Doc. 34 at ¶ 52; Doc. 32 at ¶ 29. These nondiscriminatory reasons Koch provided after litigation commenced conflict with Koch's earlier statement that Nielsen was hired in part because Gracevale wanted a male figure. There remains a question of fact about whether gender was a motivating factor in MCSD's decision not to hire Leighton.

The result is the same under the McDonnell Douglas framework. Under McDonnell Douglas, Leighton has the initial burden of showing a prima facie case of discriminatory failure to hire by showing that she: (1) is a member of a protected class; (2) applied and was qualified for an open position; (3) was rejected for that position; and (4) after she was rejected, MCSD continued to seek applicants with Leighton's qualifications.[16] Hunter v. United Parcel Serv., Inc., 697 F.3d 697, 702 (8th Cir. 2012). If Leighton establishes a prima facie case, then the burden of production shifts to MSDC to articulate a legitimate, nondiscriminatory reason for the alleged adverse action.

---

[16]Leighton agrees with MCSD that these are the four elements she must show to establish a prima facie case for her discriminatory hiring claim. Doc. 42 at 11. The elements of a prima facie case may vary depending on the facts and context of the particular situation. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981). In other discriminatory hiring cases, for instance, the Eighth Circuit has stated that the elements of a prima facie case are (1) that the plaintiff is a member of a protected class; (2) the plaintiff was qualified for an open position; (3) the employer denied the plaintiff the position; and (4) the employer filled the position with someone outside the protected class. Torgerson, 643 F.3d at 1046; Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011).

Id. If MCSD meets this burden, Leighton must produce evidence sufficient to create a genuine issue of material fact concerning whether MCSD's proffered reasons are pretext for discrimination. Id. Leighton at all times retains "the ultimate burden of proof and persuasion that [MCSD] discriminated against [her]." Torgerson, 643 F.3d at 1046.

MCSD concedes that Leighton is a member of a protected class and that she applied for and was qualified for an open position, but disputes that she can satisfy the third and fourth elements of a prima facie case. As to the third element—that MCSD rejected Leighton—MCSD contends that Leighton's undated letter to Koch and Schaefer shows that she did not apply for the K–8 position and that she therefore could not have been rejected. As discussed in footnote six of this opinion however, Leighton explained that the undated letter referred to the K–8 position as MCSD initially offered it and that she applied for the K–8 position once MCSD began advertising for two teachers at Gracevale. Beyond that, Koch admitted in his deposition that Leighton had applied for both positions with Gracevale, Doc. 43-1 at 8–9, and MCSD admitted in its answer that Leighton applied for these positions, Doc. 8 at ¶ 17. Leighton can satisfy the third element of a prima facie case because she applied for the K–8 position and MCSD rejected her and hired Nielsen instead. As to the fourth element, Leighton contends that Nielsen's hiring shows that MCSD continued seeking applicants with Leighton's qualifications after rejecting her.[17] MCSD has failed to explain how this Court could find against Leighton on the fourth element when it rejected Leighton for the K–8 position before hiring Nielsen. Leighton has satisfied the fourth element of a prima facie case.[18]

---

[17] This would be particularly true if, as MCSD contends, it offered the K–8 position to Nielsen after two others had turned down the position.

[18] MCSD's decision to reject Leighton for the K–8 position and hire Nielsen instead would also satisfy the fourth element of the prima facie case set forth in Torgerson. See Torgerson, 643 F.3d at 1046 (stating that the fourth element of a prima facie case for a discriminatory hiring claim is that the employer filled the position with someone outside the protected class).

MCSD appears to argue that Leighton cannot establish an inference of discrimination because it initially offered the K–8 position to two women, but Leighton disputes that assertion. Regardless, as explained above, Koch's statement to Leighton about Nielsen being preferred as a male by Gracevale is evidence that Leighton's gender was one of the reasons the hiring committee chose Nielsen over Leighton. Evidence that MCSD offered the job to two women before hiring Nielsen is relevant to the ultimate question of discrimination, but it is not dispositive at the summary judgment stage under these facts.

Because Leighton established a prima facie case of sex discrimination, the burden shifts to MCSD to articulate a legitimate, nondiscriminatory reason for the adverse action. Paragraph twenty-nine of Koch's affidavit contains such reasons, so the burden shifts back to Leighton to establish that the reasons are pretext. Plaintiffs typically demonstrate pretext by offering evidence that the employer's rationale is "unworthy of credence . . . because it has no basis in fact" or that "a [prohibited] reason more likely motivated the employer." Torgerson, 643 F.3d at 1047 (alteration in original) (quoting Wallace v DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006)). There is a genuine issue of fact concerning whether MCSD's justifications for not hiring Leighton are pretext. When Leighton met with Koch to discuss why she had not received an interview, Koch informed her that MCSD hired Nielsen for the K–8 position because Gracevale wanted a "male figure" at the school and someone with more math experience. This idea of having males at Gracevale appeared again in Koch's May 19, 2014 letter to Schaefer, with Koch explaining that hiring Nielsen and having the student teacher would "provide two male teachers. This is a first for the Gracevale Colony!" Doc. 43-24. Given this evidence, a reasonable jury could conclude that gender played a role in MCSD choosing Nielsen over Leighton and that the reasons set forth in paragraph twenty-nine of Koch's affidavit were pretext for discrimination.

## C.    Count III—Title VII Retaliation Claim

Title VII forbids retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).  As with her failure-to-hire claim, Leighton may avoid summary judgment on her retaliation claim by either offering direct evidence of retaliation or using the McDonnell Douglas framework to create an inference of retaliation.  Donathan v. Oakley Grain, Inc., 861 F.3d 735, 739 (8th Cir. 2017). Leighton does not argue that she has direct evidence of retaliation, but rather analyzes her claim under the McDonnell Douglas framework.  Doc. 42 at 15–24.  Under that framework, Leighton has the initial burden of establishing a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered a materially adverse employment action; and (3) the adverse employment action was causally linked to the protected activity.  Pye, 641 F.3d at 1021. If Leighton establishes a prima facie case, the burden of production shifts to MCSD to proffer "a legitimate, non-retaliatory reason for its action."  Id. (quoting Fercello v. Cty. of Ramsey, 612 F.3d 1069, 1078 (8th Cir. 2010)).  If MCDS meets this burden, Leighton must offer evidence that the proffered reason is pretext for discrimination.  Id.  Leighton at all times retains the ultimate burden of proving that an impermissible retaliatory motive was the "but-for cause" of the adverse employment action.  Donathan, 861 F.3d at 739–40 (quoting Nassar, 570 U.S. at 352).

Leighton contends that she engaged in protected activity when she told Koch she was offended by the hand-kissing incident and by him calling her a princess.  She correctly observes that Title VII does not require her to show that the conduct she opposed actually violated the law. Rather, an employee engages in protected activity under Title VII so long as she "acted in a good faith, objectively reasonable belief that the practices were unlawful."  Bonn v. City of Omaha, 623 F.3d 587, 591 (8th Cir. 2010) (quoting Barker v. Mo. Dep't of Corr., 513 F.3d 831, 834 (8th Cir.

2008)). The reasonableness of the employee's belief is measured against "the applicable substantive law." Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 549 (8th Cir. 2008).

Here, Leighton does not state which aspect of Title VII she believed Koch's conduct violated. Again, Title VII forbids retaliation against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Section 2000e-2(a) defines unlawful employment practices as (1) discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex;" or (2) limiting, segregating, or classifying an employee "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." Id. § 2000e-2(a).

As relevant here, there are two types of sex discrimination under Title VII. The first involves "economic" or "tangible" discrimination, examples of which include termination, failure to hire or promote, and denial of a transfer. The second type involves sexual harassment in the workplace. See Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (explaining that although § 2000e-2(a)(1) "mentions specific employment decisions with immediate consequences," the statute is "not limited to economic or tangible discrimination" but rather is broad enough to encompass sexual harassment) (citations and internal marks omitted). The first type of sex discrimination is of no help to Leighton. This type of sex discrimination requires an adverse employment action, which means "a *material* employment disadvantage." Brannum, 518 F.3d at 549 (quoting Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005)). Employment actions meeting this standard include "[t]ermination, reduction in pay or benefits, and changes in an employee's future career prospects." Id. (quoting Spears v. Mo. Dep't of Corr., 210 F.3d 850, 853 (8th Cir. 2000)). Because neither the kissing incident nor Koch calling Leighton a princess

come anywhere close to qualifying as an adverse employment action, Leighton could not have had an objectively reasonable belief that this conduct constituted the first type of sex discrimination. See Howard v. Walgreen Co., 605 F.3d 1239, 1245 (11th Cir. 2010) (holding that employee could not have had an objectively reasonable belief that employer violated Title VII because the telephone message the employee complained of fell "well short" of an adverse employment action); Brannum, 518 F.3d at 549 (concluding that the plaintiff could not have had a reasonable belief that she was opposing disparate treatment under Title VII because "there [was] no evidence from which a reasonable person could conclude" that an adverse employment action had occurred).

In contrast to the first type of sex discrimination, a plaintiff can prove sexual harassment without showing an adverse employment action. To prevail on a sexual harassment claim under Title VII, however, the plaintiff must show that the harassment was "so severe or pervasive as to alter the conditions of [the plaintiff's] employment and create an abusive working environment." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270 (2001) (per curiam) (quoting Faragher, 524 U.S. at 786) (internal marks omitted). This is a demanding standard, and "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not suffice. Breeden, 532 U.S. at 271 (quoting Faragher, 524 U.S. at 788). Courts consider the totality of the circumstances when deciding "whether an environment is sufficiently hostile or abusive," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher, 524 U.S. at 787–88 (second passage quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). Koch's conduct falls well short of Title VII's sexual harassment standard. He called Leighton a princess one time when describing how Gracevale thought she could do no wrong. Although Leighton testified that Koch's comment offended her, this isolated incident was

not so "severe" or "extremely serious" as to alter the conditions of Leighton's employment and create an abusive working environment. The same is true of Andersen kissing Koch's hand. It is undisputed that Koch did not initiate the kissing of his hand, that the incident lasted no more than a few seconds, and that Leighton herself had hugged Koch when she was hired full time for the 2013–2014 school year. Leighton would need to allege facts much more serious or pervasive to have an actionable sexual harassment claim. See Thibodeaux-Woody v. Houston Cmty. Coll., 593 F. App'x 280, 285 n.4 (5th Cir. 2014) (holding that a supervisor calling the plaintiff "dingy, princess, and blonde" did not create an abusive working environment); Shepard v. Frontier Commc'ns Servs., Inc., 92 F. Supp. 2d 279, 288–89 (S.D.N.Y. 2000) (declining to find sexual harassment where plaintiff had observed another female employee touch their supervisor's leg, the supervisor had referred to the plaintiff as a "queen" and "princess" on numerous occasions, and the supervisor had complained to the plaintiff when she refused to accompany him on business dinners or return his calls).

But the question here is whether Leighton could have reasonably perceived Koch's conduct as being unlawful. Case law from the Supreme Court and Eighth Circuit provides insight into how severe or pervasive conduct must be before it can support an objectively reasonable belief of sexual harassment. In Breeden, for instance, the Supreme Court held that a female employee could not have had a reasonable belief that one incident of alleged sexual harassment violated Title VII. 532 U.S. at 271. The female employee in Breeden had met with her male supervisor and a male coworker to review the psychological reports on some job applicants. Id. at 269. One of the reports mentioned that an applicant had once commented to a coworker: "I hear making love to you is like making love to the Grand Canyon." Id. The supervisor read the comment aloud, looked at the female employee, and said "I don't know what that means." Id. The other male employee

responded "Well, I'll tell you later," and both men laughed. Id. The Supreme Court held that this single incident could not "remotely be considered 'extremely serious,' as our cases require." Id. at 271 (quoting Faragher, 524 U.S. at 788). The Eighth Circuit relied on Breeden to find that a plaintiff had not engaged in protected conduct when she assisted a male coworker in reporting a comment made by their supervisor. Brannum, 518 F.3d at 548–49. The supervisor in Brannum had told the male coworker that he could not continue working in a particular unit of a correctional facility without special training. Id. at 545. When the plaintiff, who witnessed this exchange, remarked that she had yet to receive the special training, the supervisor replied that "[y]ou don't need the training, women are better by and large as they do a better job than men do anyway and are more patient and nurturing than men." Id. (alteration in original). The supervisor then removed the male coworker from the unit for the rest of the day. Id. The plaintiff sued her employer, alleging that it had retaliated against her for helping to report the supervisor's comment. Id. at 546. The Eighth Circuit held that the supervisor's "single, relatively tame comment . . . is insufficient as a matter of law to support an objectively reasonable belief it amounted to unlawful sexual harassment." Id. at 548–49. Breeden and Brannum make clear that Koch's conduct is not close enough to actionable sexual harassment to support an objectively reasonable belief that he violated Title VII.

Leighton argues that her case is comparable to Buettner v. Arch Coal Sales Co., 216 F.3d 707 (8th Cir. 2000), and Pye, 641 F.3d 1011, two cases where the Eighth Circuit found that the plaintiffs had engaged in protected conduct. The plaintiff in Buettner complained that when her female coworker resigned in frustration over not being promoted, their supervisor said that it was "just as well that she was leaving, because women and minorities don't belong in the coal business." 216 F.3d at 711. Without deciding whether this comment "would be sufficient to prove

discrimination," the Eighth Circuit concluded that the plaintiff "could demonstrate a good faith, reasonable belief that the challenged conduct violated the law."[19] Id. 714–15. In Pye, a newly-hired African American employee asked the company's payroll administrator to complete a verification form the employee needed to receive housing assistance from the county. 641 F.3d at 1015. The payroll administrator told the plaintiff to return in one week after he received a paycheck. Id. The employee returned in one week but the payroll administrator had yet to complete the form. Id. The payroll administrator told the employee that she did "not really care about his situation" and called the form "dumb." Id. After leaving the payroll administrator's office, the employee overheard her say "nigger goon." Id. The employee filed a written complaint with his supervisor stating that the payroll administrator had repeatedly failed to complete the verification form for him despite routinely completing such forms for others, had caused him to lose housing assistance by not completing the form in a timely and accurate manner, had called the form dumb, and had referred to him using a racial slur. Id. at 1015–16, 1021. During a later investigation of the complaint, the employee described the events to his employer and suggested possible remedies for the situation. Id. at 1016. The employer eventually fired the employee because it believed that his statements during the investigation constituted an attempt to get a company car or a promotion through coercion. Id. at 1016–17. The Eighth Circuit concluded that although the payroll administrator's treatment of the employee did not create a hostile work environment, the employee's written complaint and his statements during the subsequent investigation constituted protected conduct. Id. at 1018–19, 1020–22.

---

[19]The plaintiff in Buettner also cited other facts to show she had engaged in protected activity, including an email to her employer expressing concern that she would fall behind male coworkers in salary if her supervisor conducted her review, an email saying that her supervisor had implied that she was "too aggressive," and a report to human resources that her supervisor had a "problem with women." Id. at 714 n.7.

The conduct Leighton complains of is not nearly as severe as the conduct in <u>Buettner</u> and <u>Pye</u>. After all, the supervisor in <u>Buettner</u> came right out and said that women did not belong in the coal business when discussing a female who had resigned over not being promoted. 216 F.3d at 711. And the payroll administrator in <u>Pye</u> not only called the employee an extremely offensive racial slur, but also refused to complete the verification form the employee needed to secure housing assistance. 641 F.3d at 1015–16, 1021. In contrast to the blatant sexism in <u>Buettner</u> and racism in <u>Pye</u>, Koch called Leighton a princess when explaining that Gracevale thought she could do no wrong. Although calling a female employee a "princess" could qualify as an inappropriate gender stereotype, equating Koch's statement to the blatant conduct in <u>Buettner</u> and <u>Pye</u> ignores the context in which he used the term. At bottom, Leighton may have been offended by Koch's conduct, but Title VII "does not set forth 'a general civility code for the American workplace.'" <u>Burlington N. & Sante Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006) (quoting <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998)). Because Leighton could not have had an objectively reasonable belief that Koch's conduct violated Title VII, her complaint to Koch about this conduct does not constitute protected activity and she is unable to establish the first element of a prima facie case of retaliation. MCSD is entitled to judgment as a matter of law on Count III, Leighton's retaliation claim.[20]

---

[20]Leighton's argument that she engaged in protected activity focuses mainly on her February 20, 2014 meeting with Koch when she complained about the hand-kissing incident and the princess comment. However, Leighton also asserts that a reasonable jury could find that she engaged in protected activity when she "objected to [Koch] telling her that he wanted to hire a male at Gracevale;" when she met with Koch on May 28, 2014, and "reiterated her complaints and even asked if these complaints were the reason that she had not gotten an interview for the jobs she applied for;" and when she asked the MCSD school board on July 14, 2014 "to address both the inappropriate conduct she witnessed and the gender discrimination complaint." Doc. 42 at 17–18. Because Leighton did not make any of these statements before the alleged adverse employment actions, these statements cannot help her establish a prima facie case of retaliation. As stated above, Leighton must show that she suffered an adverse employment action (meaning an action that might have dissuaded a reasonable worker from making or supporting a charge of

## D.     Punitive Damages

Punitive damages were unavailable under Title VII until Congress passed the Civil Rights Act of 1991. See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 533–34 (1999). As part of this 1991 legislation, Congress amended Title VII to allow punitive and compensatory damages if the defendant "engaged in unlawful intentional discrimination" prohibited by Title VII. 42 U.S.C. § 1981a(a)(1). Section 1981a(b)(1) sets forth the standard for determining when punitive damages are available in Title VII cases:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

---

discrimination), and that this action was causally linked to her protected activity. The two adverse employment actions Leighton points to in her complaint and brief are the RIF and the failure to interview and hire her for the open positions. Doc. 1 at ¶¶ 51–61; Doc. 42 at 20. But the RIF occurred on March 10, 2014, and MCSD appears to have conducted its interviews in April 2014 and decided whom to hire by mid-May at the latest. Because the additional statements Leighton relies on to show protected conduct all occurred on May 28, 2014, or later, Leighton cannot show a causal connection between these additional statements and the earlier-occurring adverse employment actions. Tellingly, Leighton's argument that she meets the causal connection element focuses solely on the short time period between her complaints on February 20, 2014, and the RIF on March 10, 2014. Doc. 42 at 21. Leighton does not make any argument that there is a causal connection between the additional statements discussed in this footnote and an adverse employment action. To the extent Leighton believes that the hiring and interviewing process continued through May 2014, the evidence shows that MCSD had hired Nielsen by May 12, Doc. 32-3 at 4, and, at the very least, taken significant steps toward hiring Andersen before May 28, Doc. 43-25; Doc. 43-26; Doc. 43-24; Doc. 40 at ¶ 65. Thus, even if MCSD had not finalized Andersen's hiring by May 28, Leighton could not show a causal connection between complaints she made on or after this date and MCSD's decision not to hire or interview her for the Title 1 position. See Breeden, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality.").

42 U.S.C. § 1981a(b)(1). A clear majority of district courts have concluded that school boards and school districts are immune from punitive damages under Title VII because these entities qualify as a government agency or a political subdivision. See Suarez v. Sch. Bd. of Hillsborough Cty., No. 8:13-cv-1238-T-17MAP, 2015 WL 3628268, at *7 (M.D. Fla. June 10, 2015); Parsons v. Okaloosa Cty. Sch. Dist., No. 3:09cv254/WS/EMT, 2010 WL 1753152, at *3 (N.D. Fla. Mar. 30, 2010); Brown v. Baldwin Union Free Sch. Dist., 603 F. Supp. 2d 509, 518–19, 519 n.9 (E.D.N.Y. 2009) (collecting district court cases). South Dakota law also suggests that school districts are part of the State's government. See SDCL § 6-8-1 (defining a "political subdivision" for purposes of statute concerning bonds as "any county, township, improvement district, municipality, or school district in the State of South Dakota"); Gasper v. Freidel, 450 N.W.2d 226, 229 (S.D. 1990) ("School districts are state agencies exercising and wielding a distributive portion of the sovereign power of the state, and the officers of school districts are the living agencies through whom the sovereign state act is carried into effect." (quoting Bego v. Gordon, 407 N.W.2d 801, 804 (S.D. 1987))).

Leighton argues, however, that the Eighth Circuit's decision in Sanders v. Lee County School District No. 1, 669 F.3d 888 (8th Cir. 2012), shows that she can sue MCSD for punitive damages. The plaintiff in Sanders sued a school district and several school board members in their individual and official capacities under Title VII and 42 U.S.C. § 1983. Sanders v. Lee Cty. Sch. Dist. No. 1, No. 2:08CV00219 JLH, 2010 WL 358529, at *1 (E.D. Ark. Jan. 22, 2010). A jury found in the plaintiff's favor on her race discrimination and constructive discharge claims and awarded her punitive damages against three individual members of the school board. Sanders, 669 F.3d at 890. The district court set aside the constructive discharge and punitive damages verdicts and the plaintiff appealed. Id. at 890. The Eighth Circuit remanded the case to allow the plaintiff

to prove her punitive damages claim subject to the individual school board members' right to prove ignorance of federal law. Id. at 895.

Sanders does not support Leighton's argument that she can sue MCSD for punitive damages. Although the Eighth Circuit in Sanders referred to the plaintiff's causes of action as "Title VII claims," id. at 890, the district court opinion made clear that the plaintiff sued for employment discrimination under both Title VII and § 1983, Sanders, 2010 WL 358529, at *1, 3, 6. The plaintiff's decision to sue the school board members in their individual capacities under § 1983 explains why she could recover punitive damages. After all, § 1983 allows a plaintiff to recover punitive damages against a government official in the official's individual capacity. Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989). In contrast, Title VII does not allow individual capacity suits against government officials. Bonomolo-Hagen v. Clay Cent.-Everly Cmty. Sch. Dist., 121 F.3d 446, 447 (8th Cir. 1997) (per curiam) (holding that there is no individual liability under Title VII); Cross v. Ala. Dep't of Mental Health, 49 F.3d 1490, 1504 (11th Cir. 1995) (concluding that a plaintiff could not bring an individual capacity suit under Title VII against a state official because the official did not meet Title VII's definition of an "employer"); Sauers v. Salt Lake Cty., 1 F.3d 1122, 1125 (10th Cir. 1993) ("Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate."); Moss v. Texarkana Ark. Sch. Dist., 240 F. Supp. 3d 966, 973 (W.D. Ark. 2017) (granting summary judgment on Title VII claims against principal and superintendent in their individual capacities "because there is no individual liability under Title VII").[21] And because an official capacity suit

---

[21] Some federal appellate courts have stated that a "supervisor or employee cannot be held liable for a Title VII violation unless he otherwise qualifies as an 'employer.'" Sharma v. Ohio State Univ., 25 F. App'x 243, 246 (6th Cir. 2001). The complaint in Sanders alleged that the school district was the plaintiff's employer, not the individual members of the school board. Sanders v. Lee County School District, 2:08-cv-00219-JLH, Doc. 1.

is the equivalent of suing the government agency or political subdivision itself, Guzman v. Sheahan, 495 F.3d 852, 859 (7th Cir. 2007), § 1981a(b)(1) bars a Title VII plaintiff from using an official capacity suit to recover punitive damages against an employee of a government agency or political subdivision, Oden v. Oktibbeha Cty., 246 F.3d 458, 465–66 (5th Cir. 2001) (holding that § 1981a(b)(1) barred the plaintiff's Title VII claim for punitive damages against a sheriff in his official capacity). To be sure, the Eighth Circuit in Sanders did not say that the individual capacity claims under § 1983 were the reason the plaintiff could recover punitive damages against the board members. In fact, the Eighth Circuit cited to § 1981a(b)(1), the standard for determining punitive damages under Title VII.[22] Sanders, 669 F.3d at 894–95. But the Eighth Circuit in Sanders did not address and certainly did not hold that school boards and school districts somehow are not government agencies or political subdivisions. Indeed, the Eighth Circuit never discussed, and it appears that the parties never raised, the prohibition under § 1981a(b)(1) on punitive damages claims against a government, government agency, or political subdivision. Under these circumstances, Sanders cannot be read as allowing Title VII plaintiffs to recover punitive damages from school boards and school districts. See Lors v. Dean, 746 F.3d 857, 860 n.3 (8th Cir. 2014) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting Webster v. Fall, 266 U.S. 507, 511 (1925))). In accordance with the clear majority of district courts, this Court concludes that § 1981a(b)(1) prohibits Title VII plaintiffs from recovering punitive damages against a school district like MCSD. MCSD is therefore entitled to judgment as a matter of law on Leighton's punitive damages claim.

---

[22]The Eighth Circuit's reliance on § 1981a(b)(1) made no difference in the outcome of the case as the standards for punitive damages under Title VII and § 1983 are essentially the same. See Swipies v. Kofka, 419 F.3d 709, 717–18 (8th Cir. 2005).

## IV.    Conclusion

For the reasons stated above, it is hereby

ORDERED that MCSD's Motion for Summary Judgment, Doc. 29, is granted as to Counts

I and III of Leighton's complaint.  MCSD's motion is otherwise denied.  It is further

ORDERED that MCSD's Motion for Partial Summary Judgment on Punitive Damages,

Doc. 36, is granted.


DATED this _28th_ day of September, 2018.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE